IN THE DISTRICT COURT OF THE UNITED STATES FOR THE

MIDDLE DISTRICT OF ALABAMA, NORTHERN DIVISION

| | | |
|---|---|---|
| PATRICIA JOYCE PATTERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NO. |
| v. | ) | 2:22cv99-MHT |
| | ) | (WO) |
| THOMAS J. VILSACK, | ) | |
| Secretary, U.S. Department | ) | |
| of Agriculture, | ) | |
| | ) | |
| Defendant. | ) | |

OPINION

Plaintiff Patricia Joyce Patterson worked for two days in 1993 as a veterinarian for the United States Department of Agriculture.  She reapplied for positions with the Department in 1998 and 2010, but her applications were denied.  She filed this lawsuit against defendant Thomas J. Vilsack, the Secretary of Agriculture, contending that the 1998 and 2010 rejections constituted unlawful racial discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 1981a and

2000e through 2000e-17. Jurisdiction is proper pursuant to 42 U.S.C. § 2000e-5(f)(3) (Title VII), 28 U.S.C. § 1331 (federal question), and 28 U.S.C. § 1343 (civil rights).

Vilsack has filed a motion for summary judgment, arguing that there was no consideration of race in the decisions not to hire Patterson and that the Department never retaliated against her. The court heard oral arguments on January 23, 2024. For the reasons set forth below, the court will grant Vilsack's motion as to both the racial discrimination and retaliation claims.


## I. SUMMARY-JUDGMENT STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To determine whether a genuine factual dispute exists, the court

2

must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, "conclusory assertions," without admissible supporting evidence, "are insufficient to withstand summary judgment." *Holifield v. Reno*, 115 F.3d 1555, 1564 n.6 (11th Cir. 1997), *abrogated on other grounds by Lewis v. City of Union City*, 918 F.3d 1213 (11th Cir. 2019) (en banc). In general, summary judgment is appropriate when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita*, 475 U.S. at 587.

## II. FACTUAL BACKGROUND

The facts, taken in the light most favorable to Patterson, are as follows.

The Department hired Patterson, an African-American woman, as a supervisory veterinary medical officer on

3

January 11, 1993.  Later that month, she spent two days in Tallahassee, Florida, for her orientation.  While there, she requested an advance of funds to travel to Guntersville, Alabama, where she was expected to appear after the orientation to continue her training.  An area supervisor, a white man, told her that she should either travel to Guntersville and await the funds or tender her badge in resignation.  Patterson handed him her badge and left Tallahassee.

A few days later, Patterson received two letters, one from the area supervisor and another from a regional director, who was also a white man.  Each letter purported to terminate her from her position effective February 5, 1993, for failing to appear in Guntersville and "refusing" to resign voluntarily. Record of Investigation ("ROI") (Doc. 53-54) at 35-37. Patterson replied in writing to each supervisor that her decision to turn in her badge signified a voluntary resignation.  To her, the difference between a

**4**

resignation and termination was not merely semantic, as having a termination in her official personnel file could prevent her from obtaining other federal employment. The Department nonetheless updated her personnel file to indicate that she had been terminated from her position.

On January 20, 1998, the Department inquired about her availability for a position as a veterinary medical officer in New Brockton, Alabama. Per the Department's instructions, Patterson had her fingerprints taken and submitted a fingerprint card, which noted her race. She also completed a declaration for federal employment, which asked whether she had been "fired from any job" with the federal government "[d]uring the last [five] years." OF-306 (Doc. 45-14) at 1. Patterson answered in the negative and certified that her declaration was correct and complete.

The Department conducted a routine background check and discovered that her personnel file listed her as

terminated from her 1993 position.  On March 27, 1998,
Linda Hicke, a white woman who worked as a personnel
staffing specialist, sent Patterson a letter stating
that, because Patterson had not disclosed the
termination, the declaration she submitted "appear[ed]
to have been falsified," and so the Department would
not consider her candidacy.  ROI (Doc. 53-54) at 195.

Patterson replied to Hicke in writing, explaining
that she had resigned voluntarily, and attached copies
of her correspondence with her former supervisors.  She
added the following in her message to Hicke: "Cultural
experience has provided numerous opportunities for one
in my walk of life to expect the kind of paper
exclusion that I am experiencing with this opportunity
for employment." *Id.* at 196.  The position ultimately
went to another African-American woman.

On November 9, 1998, Patterson filed a formal Equal
Employment Opportunity (EEO) charge, claiming race and
sex discrimination based on her interactions with her

supervisors in 1993 and the rejection of her candidacy in 1998.[1]   The Department referred only the 1998 incident for investigation and determined that the allegations related to her employment in 1993 were untimely.   Patterson had failed to exhaust her administrative remedies because she had not contacted an EEO counselor within 45 days of receiving word of her termination in 1993.   *See* 29 C.F.R. § 1614.105(a)(1).

She participated in mediation with the Department over the allegations from 1998 on December 6, 1999. The Department offered to remove the termination from her personnel file, pay her $ 30,000, and hire her for a position as a veterinarian in Jack, Alabama.   She rejected the offer because she did not wish to work in Jack.   Notwithstanding the mediation's breakdown, she

---

1. Instead of filing charges with the Equal Employment Opportunity Commission, federal-sector employees file charges with the agencies where they work. Before doing so, they must contact an EEO counselor affiliated with that agency.

recalls a Department official promising to update her personnel file to reflect a voluntary resignation rather than a termination.

She applied for two more Department positions in 2010, only to be told she was ineligible. She contacted MaryKathryn Acker, a white woman who worked as a human resources officer, who informed her that her personnel file still included the 1993 termination. Patterson submitted another formal EEO charge--alleging racial discrimination, sex discrimination, and reprisal--based on the Department's failure to correct her personnel file. The Department could not determine if Patterson's prior charge had been fully investigated, so it consolidated the 1998 and 2010 EEO charges and referred them both for investigation.

On February 16, 2011, the Department updated Patterson's personnel file to replace the 1993 termination with a voluntary resignation. The parties then went before an administrative law judge on April

8

22, 2013.  Four years later, the administrative law judge issued an opinion siding with Patterson on her claims of race and sex discrimination.  After nearly four more years, the Equal Employment Opportunity Commission reversed the administrative law judge and, on November 29, 2021, declined to reconsider its decision.  Patterson filed this lawsuit three months later.


### III. DISCUSSION

Patterson claims unlawful racial discrimination and retaliation based on the Department's refusal to consider her candidacy in 1998 and 2010 due to the termination in her personnel file.  Although her EEO charges each alleged gender discrimination, she does not press that theory here.

Nor does she assert any claim for relief based on her employment in 1993.  Her brief opposing Vilsack's summary-judgment motion emphasizes that her claims of

discrimination relate only to the allegations referred for EEO investigations. *See* Br. in Opp. (Doc. 53) at 1. At oral argument before the court, she affirmed that only her claims about the 1998 and 2010 applications are at issue. *See* Rough Draft Tr. at 4.[2]

As for those claims, Patterson has failed to show that her race or protected activity factored in any way into the Department's decisions not to consider her candidacy. Vilsack is therefore entitled to judgment as a matter of law.[3]

---

2. In any event, the allegations related to Patterson's 1993 employment are time-barred, as she waited longer than 45 days to contact an EEO counselor. Additionally, the record does not reflect that she sought review of the decision to dismiss the allegations related to her 1993 employment after the Department consolidated her 1998 and 2010 charges and referred them for investigation.

3. Because Patterson's disparate-treatment and retaliation claims fail for lack of causation, the court need not and does not address Vilsack's alternative arguments regarding the doctrine of laches or the timeliness of the 2010 EEO charge.

a. Disparate Treatment Based on Race

Title VII's federal-sector provision states: "All personnel actions affecting employees or applicants for employment ... in executive agencies ... shall be made free from any discrimination based on race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-16(a). A federal-sector plaintiff can succeed on a Title VII claim by showing that discriminatory considerations "tainted" the personnel action. *Babb v. Sec'y, Dep't of Veterans Affs.*, 992 F.3d 1193, 1204 (11th Cir. 2021) (quoting *Babb v. Wilkie*, 589 U.S. 399, 406 (2020)). The plaintiff need not prove that discrimination was the but-for cause of the personnel action, only that "discrimination played *a role* in the decision-making ... regardless of whether that discrimination shifted the ultimate outcome." *Babb*, 992 F.3d at 1205 (emphasis in original).[4]

---

4. Patterson's complaint claims to seek relief under 42 U.S.C. § 2000e-2(a)(1), Title VII's general prohibition against employment discrimination. *See*

11

Patterson has not shown that racial discrimination played any role in the Department's decision-making. Her disparate-treatment claims face two insurmountable hurdles: the relevant decision-makers were unaware of her race and treated her exactly as the Department required them to treat all candidates with terminations in their personnel files.

First, the Department officials she identifies in connection with her 1998 and 2010 job applications did not know her race until after the Department rejected her candidacy. Discrimination could not have factored into the Department's decisions not to hire her when the relevant decision-makers were unaware that she belonged to a protected class.

---

Compl. (Doc. 4) ¶ 56. Title VII's federal-sector provision is nonetheless the applicable statute because the complaint concerns Patterson's applications for federal employment. The court notes that analyzing Patterson's disparate-treatment and retaliation claims under § 2000e-2(a)(1) would not compel a different result from the one reached below, as § 2000e-2(a)(1) does not impose a less demanding standard of causation than § 2000e-16(a).

Patterson's complaint identifies two Department officials whom she engaged with in 1998 and 2010: Hicke, who wrote to Patterson in 1998 that her declaration for federal employment "appear[ed] to have been falsified," ROI (Doc. 53-54) at 195; and Acker, the human resources officer who informed Patterson over the phone that she was ineligible for the jobs she sought in 2010 because of the termination in her file.[5]

Hicke had not met Patterson before corresponding with her in writing. Patterson insists that her fingerprint card, which she submitted as part of her application for the New Brockton position, put Hicke on

---

5. The only other Department officials named in the complaint are those whom Patterson engaged with in 1993; Catherine Strub, who signed the 1998 inquiry as to availability; Arthur Simmons, who represented the Department during the 1999 mediation; and Ronald Hicks, who provided information about how Patterson would be reimbursed for the costs of her travel to the 1999 mediation. None of these officials are relevant decision-makers for assessing Patterson's disparate-treatment claim (or the retaliation claim discussed below) because she does not allege that any of them had a hand in rejecting her 1998 and 2010 applications.

notice of her race. But the government's evidence, which Patterson has not disputed, indicates that Hicke did not see applicants' fingerprint cards, which went to another government office. *See* Hicke Aff. (Doc. 45-6) at 17. Patterson has offered no other evidence to suspect that Hicke knew her race when the Department rejected her candidacy in 1998.

Nor does Patterson even contend that Acker knew her race before the Department rejected her applications in 2010. The two had never met in person, and they spoke on the phone only after the Department decided not to proceed with Patterson's candidacy. Because neither Hicke nor Acker knew Patterson's race before the Department denied her applications for employment, they could not have subjected her to racial discrimination.

The second reason Patterson's disparate-treatment claims fail is that neither Hicke nor Acker had any discretion to alter or disregard the termination in her personnel file. Patterson does not have evidence to

14

contradict the government's submission that Hicke was
obligated to dismiss Patterson's candidacy upon
discovering the termination.  Even Patterson recognizes
that Hicke, in sending the letter apprising her of the
background check, was simply "perform[ing] the duties
for which she was instructed to do."  Patterson Aff.
(Doc. 45-1) at 21.  Patterson nonetheless argues that
her written reply put Hicke on notice of the need to
reexamine her personnel file.  But Patterson cannot
point to any Department policy obligating Hicke to
investigate the termination.  *See* Rough Draft Tr. at 8.

Acker had no more discretion than Hicke did when,
in 2010, she relayed why the Department could not move
forward with Patterson's job applications.  Acker's
authority reached no further than informing Patterson
about the termination in her personnel file and
explaining how it affected her eligibility for federal
employment.

In sum, an employer cannot discriminate based on

race without knowledge of the complainant's race and the discretion to discriminate. *See Lubetsky v. Applied Card Sys., Inc.*, 296 F.3d 1301, 1306 (11th Cir. 2002) ("[A]n employer cannot intentionally discriminate against an individual based on his religion unless the employer knows the individual's religion."). Hicke and Acker had neither, and Patterson identifies no other Department official who rejected her job applications for racially biased reasons. Therefore, Patterson has failed to establish causation--that is, that racial discrimination tainted the Department's decision-making. Summary judgment will be granted in Vilsack's favor.


   b. Retaliation

   Although Title VII's federal-sector provision does not mention retaliation explicitly, courts have "construed § 2000e-16(a)'s prohibition of 'any discrimination' to directly 'bar[] reprisals against

federal employees who file charges of discrimination.'" *Babb*, 992 F.3d at 1203 (quoting *Porter v. Adams*, 639 F.2d 273, 278 (5th Cir. Mar. 13, 1981)).[6]   As with disparate-treatment claims, the federal-sector provision does not require plaintiffs alleging retaliation to establish but-for causation. *See Tonkyro v. Sec'y, Dep't of Veterans Affs.*, 995 F.3d 828, 835 (11th Cir. 2021).   A retaliation claim will survive summary judgment under the federal-sector provision if a triable issue of fact exists over whether a complainant's protected activity factored at all into an adverse personnel action. *See Babb*, 992 F.3d at 1205.

Patterson contends that she engaged in two forms of protected activity in 1998.   First, after Hicke sent Patterson a letter updating her about the government's

---

6. In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

background check, Patterson responded in writing and
"complained to ... Hicke about the discriminatory
treatment ... to which she was being subjected." Br.
in Opp. (Doc. 53) at 6. Second, she filed an EEO
charge, which Hicke became aware of when she was
contacted by an EEO counselor on April 15, 1998. *See
id.* at 7. Even by Patterson's own account, any
purportedly protected activity in which she engaged
postdated Hick's letter. Hicke could not have
retaliated against Patterson based on the contents of a
letter Patterson had yet to send or an EEO
investigation that had yet to occur. Moreover, even
after Hicke read Patterson's message and learned about
the EEO charge, she lacked the authority to rescind the
letter dismissing Patterson's candidacy.

The retaliation claim based on Patterson's 2010
applications fares no better. By then, she had
participated in mediation with the Department, which,
like filing the 1998 EEO charge, qualifies as protected

activity.   But the uncontroverted evidence indicates that Acker did not know about Patterson's 1998 EEO charge or attempted mediation until after their phone conversation. *See* ROI (Doc. 53-54) at 120-21.   Because Acker did not know about the protected activity--and because, in any event, she lacked the discretion to overlook the termination--she could not have retaliated against Patterson either.

Patterson has therefore failed to establish a triable issue of fact as to causation for any of her theories of retaliation.   Vilsack is entitled to judgment as a matter of law.


c. Mendacity

Patterson makes one final argument to support her disparate-treatment and retaliation claims that warrants discussion.   On her telling, "[t]he overwhelming evidence indicates that Plaintiff resigned and was not terminated" in 1993.   Br. in Opp. (Doc. 53)

19

at 25. She insists that because she was not actually terminated, the Department had no nondiscriminatory reason not to hire her in 1998 and 2010. She asks the court to infer racial discrimination and retaliation from the Department officials' "mendacity." *Id.* at 23 (quoting *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 511 (1993)). In other words, Patterson posits that the Department's stated rationale for not hiring her was so "false, fraudulent, [and] knowingly deceitful" that it raises a likelihood of discrimination. Br. in Opp. (Doc. 53) at 23.

The record does not suggest that any Department official's conduct was fraudulent. The Department may well have been wrong to place the termination in Patterson's personnel file in 1993 and to wait so long before correcting the mistake nearly two decades later. But that does not mean that the Department officials who considered her applications in 1998 and 2010 acted with a racially biased or retaliatory motive. After

20

all, an employer is free to hire or reject candidates
"for a good reason, a bad reason, a reason based on
erroneous facts, or for no reason at all, as long as
its [decision] is not for a discriminatory reason."
*Flowers v. Troup Cnty. Sch. Dist.*, 803 F.3d 1327, 1338
(11th Cir. 2015) (quoting *Nix v. WLCY Radio/Rahall
Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984)).
Patterson cannot prevail on her claims of
discrimination in 1998 and 2010 by relitigating whether
the Department accurately kept personnel records in
1993. However "overwhelming" the evidence that she
voluntarily resigned may or may not be, it does not
raise a presumption of discrimination.

The question before the court is not whether
Patterson resigned or was terminated in 1993. The
question is whether there is enough evidence in the
record for a reasonable factfinder to determine that
the Department subjected her to racial discrimination
and retaliation. For the foregoing reasons, the court

concludes there is not. Accordingly, Vilsack is entitled to judgment as a matter of law on both the disparate-treatment and retaliation claims.

***

An appropriate judgment will be entered.

DONE, this the 23rd day of February, 2024.

_/s/ Myron H. Thompson_
**UNITED STATES DISTRICT JUDGE**

22